# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CONGREGATION OF THE PASSION, HOLY CROSS PROVINCE and REV. ALFREDO OCAMPO,<br><br>Plaintiffs,<br><br>v.<br><br>JEH JOHNSON, Secretary of U.S. Department of Homeland Security; LEON RODRIGUEZ, Director of U.S. Citizenship and Immigration Services, and KATHY BARAN, Director of USCIS California Service Center,[1]<br><br>Defendants. | No. 13 C 02275<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

The plaintiffs, Congregation of the Passion (the "Passionists") and Rev. Alfredo Ocampo ("Ocampo"), bring this action against the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services ("USCIS"), and the Director of USCIS's California Service Center for violations of the Administrative Procedure Act (the "APA"), the Religious Freedom Restoration Act ("RFRA"), and the First and Fifth Amendments. The plaintiffs challenge portions of the USCIS regulations pertaining to special immigrant religious workers as well as USCIS's denial of the Passionists' petition to qualify Ocampo for a special immigrant religious worker visa. The parties have cross-moved for summary judgment. For the reasons set forth below, the Court grants the plaintiffs' motion and denies the defendants' motion.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jeh Johnson, Leon Rodriguez, and Kathy Baran are substituted for Janet Napolitano, Alejandro Mayorkas, and Donna Campagnolo, respectively.

## BACKGROUND

The Passionists are an international Roman Catholic order of priests, brothers, nuns, sisters, and laity. Ocampo is a native and citizen of Mexico who has lived in the United States since 1994. He began working as a vowed member of the Passionists in 2004, was ordained as a priest in 2011, and currently serves as a priest with the Passionists' community in Houston, Texas; this community is part of the Passionists' Holy Cross Province, which is based in Park Ridge, Illinois. Although Ocampo entered the United States lawfully on a B-2 visitor visa in 1994, he has been unlawfully present in the country since that visa expired in 1995. For reasons that will be explained below, his U.S. citizen brother filed an I-130 petition to classify Ocampo as the sibling of a U.S. citizen in 1998 and the Passionists filed an I-360 petition to classify Ocampo as a special immigrant religious worker in 2012.

Ocampo seeks classification as a special immigrant religious worker so that he may apply for an adjustment of his immigrant status to lawful permanent resident. The Immigration and Nationality Act (the "INA") permits certain individuals (primarily those already in the United States) to adjust their status to become lawful permanent residents. *See* 8 U.S.C. § 1255. Through the adjustment of status process, a person who is already in the country is "assimilated to the position of an applicant for entry into the United States." *Samirah v. Holder*, 627 F.3d 652, 656 (7th Cir. 2010) (quoting *Palmer v. INS*, 4 F.3d 482, 484 (7th Cir. 1993)) (internal quotation marks omitted). The primary adjustment of status mechanism, which is set forth in § 1255(a), is not available to most individuals who are in an unlawful immigration status or who have previously violated U.S. immigration laws. *See* 8 U.S.C. § 1255(c) (listing eight categories of aliens who, absent exceptions, cannot use the subsection (a) adjustment of status mechanism, chiefly due to violations of U.S. immigration laws). Notably, however, the statute also provides

four specialized adjustment of status mechanisms which are available to those who may not meet the requirements of § 1255(a). *See id.* § 1255(i) (for certain aliens who do not qualify to adjust status under subsection (a), including those in unlawful immigration status); *id.* § 1255(j) (for certain aliens who supplied useful information for criminal investigations); *id.* § 1255(l) (for certain victims of trafficking); *id.* § 1255(m) (for certain victims of crimes against women). Approval of applications to adjust status under § 1255 is discretionary. *See, e.g.*, *id.* § 1255(a) ("[t]he status of an alien . . . may be adjusted by the Attorney General, in his discretion"); *id.* § 1255(i)(2) ("the Attorney General may adjust the status of the alien").

Ocampo hopes to qualify for adjustment of status under the procedure set forth in § 1255(i). To apply for adjustment of status under § 1255(i), an alien: (1) must be physically present in the United States; (2) must be within one of the classes listed in § 1255(c); (3) must be the beneficiary of a petition for classification under § 1154,[2] or an application for labor certification under § 1182(a)(5)(A), that was filed by April 30, 2001; (4) must have been physically present in the United States on December 21, 2000, unless the petition for classification or application for labor certification was filed on or before January 14, 1998; and (5) must have an immigrant visa immediately available to him or her based on an approved visa petition. *See* 8 U.S.C. § 1255(i)(1); C.F.R. § 245.2(a)(2)(i); *see also* 8 U.S.C. § 1255(i)(2)(B).

Ocampo currently meets all but one of these requirements. He meets the first requirement because he is physically present in the United States. He meets the second requirement because

---

[2] Section 1154 provides, *inter alia*, that U.S. citizens may petition to classify their alien relatives under certain of the relationship categories set forth in § 1153(a), including § 1153(a)(4), which covers siblings of U.S. citizens. *See* 8 U.S.C. § 1154(a)(1)(A)(i); *see also id.* § 1153(a)(4). Petitions to classify a person under § 1153(a) must be filed on Form I-130. *See* 8 C.F.R. § 204.1(a)(1). A person who has been classified as the sibling of a U.S. citizen through an approved I-130 petition is entitled to receive an immigrant visa, but there are caps on the number of visas made available to such individuals each year. *See* 8 U.S.C. § 1153(a)(4).

he fits within at least one of the classes listed in § 1255(c). *See* 8 U.S.C. § 1255(c)(2) ("an alien . . . who . . . accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed . . . to maintain continuously a lawful status since entry into the United States"). He meets the third requirement based on the I-130 petition which was filed by his brother on January 14, 1998, and approved by USCIS on December 29, 1998. *See* Administrative Record, Dkt. 13-1, at 20; *see also* note 2, *supra*. And he meets the fourth requirement both because he has been physically present in the United States since 1994 and because the priority date on his I-130 petition is January 14, 1998.

Ocampo does not, however, meet the final requirement to apply for adjustment of status because an immigrant visa is not "immediately available" to him.[3] Even though the I-130 petition to classify Ocampo as the sibling of a U.S. citizen was filed and approved in 1998, a visa is not yet available to him based on that petition because of the high number of similarly-situated people waiting to receive visas.[4]

In light of the long wait time for a visa to become available to Ocampo based on his classification as the sibling of a U.S. citizen, Ocampo and the Passionists opted to pursue another

---

[3] The defendants do not dispute that this is the reason Ocampo is unable to apply for adjustment of status. *See, e.g.*, Defendants' Mem., Dkt. 19, at 1 (stating that Ocampo "is not yet able to apply for permanent resident status . . . because a visa [is] not . . . immediately available").

[4] Currently, visas are available to Mexican beneficiaries of petitions to classify them as siblings of U.S. citizens only if the priority date of their I-130 petition is before April 22, 1997. *Visa Bulletin for February 2015*, U.S. Dep't of State (Jan. 9, 2015), http://travel.state.gov/content/visas/english/law-and-policy/bulletin/2015/visa-bulletin-for-january-2015.html. At the time the plaintiffs moved for summary judgment, visas for such individuals were available only if the priority date of their petition was before October 8, 1996. *See Visa Bulletin for September 2013*, U.S. Dep't of State (Aug. 12, 2013), http://travel.state.gov/content/visas/english/law-and-policy/bulletin/2013/visa-bulletin-for-september-2013.html. Since the priority date on Ocampo's I-130 petition is January 14, 1998, a visa based on that petition will likely not become available until fall 2015 or later.

method to satisfy the immediately available visa requirement so that Ocampo would be able to apply for adjustment of status under § 1225(i) sooner. To that end, in 2012, the Passionists filed an I-360 petition to classify Ocampo as a special immigrant religious worker.[5] Since there are no wait times for individuals classified as special immigrant religious workers to receive visas, *see* note 5, *supra*, approval of the I-360 petition would make a visa immediately available to Ocampo and thus would allow him to apply for adjustment of status under § 1255(i).

The INA defines a special immigrant religious worker as an immigrant who:

> (i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;
>
> (ii) seeks to enter the United States, (I) solely for the purpose of carrying on the vocation of a minister of that religious denomination, (II) . . . in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or (III) . . . in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and

---

[5] Petitions for classification as a special immigrant religious worker may be filed either by the alien or by any person on behalf of the alien. *See* 8 U.S.C. § 1154(a)(1)(G)(i); *see also id.* § 1101(a)(27)(C) (creating the category of special immigrant religious workers). Such petitions must be filed on Form I-360. *See* 8 C.F.R. § 204.5(a). A person who has been classified as a special immigrant religious worker through an approved I-360 petition is entitled to receive an immigrant visa. *See* 8 U.S.C. § 1153(b)(4). Although there are caps on the number of visas made available to special immigrant religious workers each year, *see id.*, visas are currently available for all Mexican beneficiaries of petitions to classify them as special immigrant religious workers. *Visa Bulletin for February 2015*, U.S. Dep't of State (Jan. 9, 2015), http://travel.state.gov/content/visas/english/law-and-policy/bulletin/2015/visa-bulletin-for-january-2015.html. Visas were also currently available for all such individuals at the time the Passionists filed the I-360 petition on Ocampo's behalf. *See Visa Bulletin for September 2012*, U.S. Dep't of State (Aug. 9, 2012), http://travel.state.gov/content/visas/english/law-and-policy/bulletin/2012/visa-bulletin-for-september-2012.html.

> (iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i).

8 U.S.C. § 1101(a)(27)(C). USCIS regulations impose several additional requirements for qualifying as a special immigrant religious worker, including a requirement that if an immigrant has performed the two years of qualifying religious work while in the United States, the work must have been authorized under U.S. immigration law. *See* 8 C.F.R. § 204.5(m)(4) ("[The immigrant must h]ave been working in one of the [qualifying] positions . . . , either abroad or in lawful immigration status in the United States, . . . for at least the two-year period immediately preceding the filing of the petition"); *id.* § 204.5(m)(11) ("Qualifying prior experience[,] . . . if acquired in the United States, must have been authorized under United States immigration law.").

Applying these regulations, USCIS denied the Passionists' I-360 petition on the ground that Ocampo's qualifying religious work experience was obtained in the United States while Ocampo was not in lawful immigration status. The Passionists did not appeal this decision to the Administrative Appeals Office, so the denial became USCIS's final decision in the matter. The Passionists and Ocampo filed the instant lawsuit on March 21, 2013, requesting that the Court declare 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11) to be invalid and order USCIS to rescind its decision on the Passionists' I-360 petition and issue a new decision granting the petition. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.[6]

---

[6] Two jurisdictional issues warrant brief explanation. First, although the INA bars review of most discretionary decisions, *see* 8 U.S.C. § 1252(a)(2)(B), federal courts have jurisdiction to review denials of I-360 petitions and other similar visa petitions because approval of such petitions is mandatory for beneficiaries who meet the statutory requirements. *See id.* § 1153(b)(4); *id.* § 1154(b); *Ogbolumani v. Napolitano*, 557 F. 3d 729, 732-33 (7th Cir. 2009);

ANALYSIS

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the plaintiffs challenge both an agency decision and the regulations on which that decision was based. Pursuant to the APA, a court may set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and may compel agency action that has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. A court reviewing agency regulations must first determine whether Congress "has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n.9. Only where those tools fail to elucidate the statutory intent must a court uphold the challenged regulations, and even then only as long as they reflect a "reasonable interpretation" of the statute. *Id.* at 843-44. A reasonable interpretation "must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

---

*Soutane v. U.S. Dep't of Justice*, 381 F.3d 143, 146-48 (3d Cir. 2004). Second, the Court rejects the defendants' argument that Ocampo does not have standing to challenge the denial of the Passionists' I-360 petition and that the Court therefore does not have subject matter jurisdiction over Ocampo's claims. The APA gives any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by an agency action within the meaning of a relevant statute" the right to seek federal court review of the agency action. 5 U.S.C. § 702. Since Ocampo's immigration status is implicated by USCIS's denial of the Passionists' petition, he has standing to challenge that denial in federal court. *See, e.g.*, *Constr. & Design Co. v. USCIS*, 563 F.3d 593, 597-98 (7th Cir. 2009); *Ghaly v. INS,* 48 F.3d 1426, 1434 n.6 (7th Cir. 1995); *Cassell v. Napolitano*, No. 12-CV-9786, 2014 WL 1303497, at *7 n.1 (N.D. Ill. Mar. 31, 2014); *Shalom Pentecostal Church v. Napolitano*, Civ. No. 11-4491 (RMB/AMD), 2013 WL 162986, at *3-4 (D.N.J. Jan. 15, 2013).

(1997)). "Thus, an agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole,' does not merit deference." *Id.* (alteration in original) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013)).

The plaintiffs argue that USCIS's denial of the Passionists' I-360 petition should be invalidated under the APA because the decision was based on 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11), which the plaintiffs contend are *ultra vires*. The defendants argue that the regulations are entitled to *Chevron* deference and that USCIS's denial of the I-360 petition on the basis of those regulations was therefore not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Pursuant to *Chevron*, the Court must begin its analysis by determining whether Congress "had an intention on the precise question at issue." 467 U.S. at 842. That question is whether the qualifying prior religious work described in § 1101(a)(27)(C) must have been authorized under U.S. immigration law if that work was performed in the United States. The statute states that to qualify as a special immigrant religious worker, an immigrant must have been "carrying on [the vocation of a minister, professional work for a qualifying organization, or other work for a qualifying organization] continuously for at least the 2-year period [immediately preceding the time of application for admission]." 8 U.S.C. § 1101(a)(27)(C)(iii); *see also id.* § 1101(a)(27)(C)(i); *id.* § 1101(a)(27)(C)(ii).

There is no ambiguity in § 1101(a)(27) concerning the authorization status of prior religious work experience: *any* work "carrying on the vocation of a minister" of a qualifying religious denomination that is performed "continuously" for the two years "immediately preceding the time of application for admission" suffices to meet the requirements of

8

§ 1101(a)(27)(C)(iii).[7] The statutory text imposes no requirement that the work experience have been gained while in a lawful, work-authorized, immigration status if that work was performed in the United States, either expressly or by implication. There is no need to open up the entire toolbox of statutory interpretation here; only one tool is needed and it is the one that applies the text of a statute as written. "Under *Chevron*'s first step, the plain language of a statute is the most reliable indicator of congressional intent. It should be conclusive except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Castellon-Contreras v. INS*, 45 F.3d 149, 153 (7th Cir. 1995) (alteration in original) (citations and internal quotation marks omitted).

There is no reason to conclude that Congress intended, but failed, to impose a requirement that would limit qualifying work experience to that performed while in a lawful immigration status. To say the least, it would be difficult to believe—and the defendants do not argue—that Congress simply overlooked the critical issue of whether work while in an unlawful immigration status should count for purposes of qualifying as a special immigrant religious worker. That is the metaphorical elephant in the room in the context of employment-based immigrant visas. Had Congress wished to require individuals presently in the country to have lawful work experience in order to qualify as special immigrant religious workers, it surely would have said so. *Accord Shalom Pentecostal Church v. Napolitano*, Civ. No. 11-4491 (RMB/AMD), 2013 WL 162986, at *5 (D.N.J. Jan. 15, 2013) ("[T]he Statute is not 'silent' as to the legal status of work performed in the United States-it is inclusive of *all* work performed

---

[7] For the sake of simplicity, the Court refers only to the type of work described in § 1101(a)(27)(C)(ii)(I) ("the vocation of a minister"). The Court's analysis, however, applies equally to the other two types of work described in § 1101(a)(27)(C)(ii) ("work . . . in a professional capacity in a religious vocation or occupation" and "work . . . in a religious vocation or occupation").

9

inside and outside the United States, whether lawful or unlawful . . . ."). The absence of any such requirement does not make the statute ambiguous or subject to interpretation; it makes it unequivocal. *Cf. Brown v. Gardner*, 513 U.S. 115, 116-20 (1994) (concluding that imposition of regulatory "fault" requirement on statute that required compensation for any "injury," without regard to fault, was inconsistent with the plain language of statute); *Lewis v. United States*, 445 U.S. 55, 60-65 (1980) (holding that Congress intended no limitation on coverage of statute where the text contained no modifier or exception or other suggestion of any such limitation).

Indeed, where Congress wished past or current compliance with U.S. immigration laws to affect an individual's eligibility to become a permanent resident, it stated so explicitly. For example, § 1255(c)(2) states that, absent exceptions, an alien who "continues in or accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status" is ineligible for adjustment of status under the primary adjustment mechanism in § 1255(a). But one of the alternate adjustment of status mechanisms that Congress provided applies expressly to those unlawfully within the United States and "[n]otwithstanding" the restrictions listed in § 1255(c). *See* 8 U.S.C. § 1255(i). Similarly, one of the exceptions to § 1255(c)(2) permits certain employment-based immigrants to adjust status notwithstanding specified violations of U.S. immigration law, as long as the violations lasted no more than 180 days in the aggregate. *See id.* § 1255(k). Thus, Congress chose to explicitly excuse unlawful presence and unauthorized employment in particular circumstances. There is, then, no basis to assume, as USCIS implicitly does, that Congress's employment of unequivocal statutory language was a mistake or oversight in need of correction by agency action. The statutory definition of special immigrant religious

worker plainly and unequivocally applies without regard to an alien's work authorization status. There is nothing ambiguous about it.

That Congress factored lawful immigration status into § 1255, but not § 1101(a)(27)(C), demonstrates its intent that violations of U.S. immigration law be considered at the adjustment of status stage, not upon review of petitions for classification as a special immigrant religious worker. This approach is reflected in, and consistent with, the structure of the INA as a whole. Section 1101 creates numerous immigrant categories (including the category of special immigrant religious workers in subsection (a)(27)(C)), § 1153 entitles beneficiaries of petitions for classification under those immigrant categories to receive visas (subject to annual caps in certain cases), and § 1255 provides mechanisms for such beneficiaries to apply for adjustment of status if they are already living in the United States. Thus, the INA contemplates that individuals both abroad and in the United States will be classified under the immigrant categories established in § 1101, that individuals both abroad and in the United States will be entitled to visas on the basis of their immigrant classification, and that those already in the country will be subject to the procedures of § 1255 when seeking adjustment of status—which, again, is a process that "assimilate[s]" a person already in the country "to the position of an applicant for entry into the United States." *Samirah*, 627 F.3d at 656 (quoting *Palmer*, 4 F.3d at 484) (internal quotation marks omitted).

Ultimately, then, it is USCIS's interpretation that is at odds with the statutory scheme Congress has adopted with respect to immigrant classification and admission to permanent residence. USCIS's interpretation of § 1101(a)(27)(C)(iii) would effectively repeal the adjustment of status process Congress has provided to aliens like Ocampo, by making the lawfulness of prior immigration status a factor that prevents classification as a special immigrant

religious worker and therefore prevents qualification for consideration of adjustment of status. The defendants offer no argument that justifies the adoption of an interpretation that both contravenes the plain meaning of the statute and is inconsistent with the overall structure and purpose of the statutory scheme.

Indeed, the defendants offer no argument that the statutory provision concerning work experience, 8 U.S.C. § 1101(a)(27)(C)(iii), is itself ambiguous. Instead, they maintain that because a separate provision in the definition of special immigrant religious workers refers to immigrants who "seek[] to enter the United States," *id.* § 1101(a)(27)(C)(ii), there is ambiguity about whether individuals already within the United States can be classified as special immigrant religious workers and thus whether qualifying work can be performed inside the United States.[8] As the defendants concede, however, USCIS interprets the statutory language "seeks to enter the United States" to include beneficiaries of I-360 petitions "who are outside the United States at the time the petition is filed as well as beneficiaries who are inside the United States at the time the petition is filed." Defendants' Mem., Dkt. 19, at 5.

The upshot of this concession is that there is no justification for reading into the statutory work experience requirement a restriction excluding work performed inside the United States but in an unlawful work-authorization status. Certainly the defendants supply none. They do not explain, for example, how the purported ambiguity regarding acceptable *locations* for qualifying work empowers USCIS to promulgate regulations imposing a requirement regarding

---

[8] The defendants' discussion of this purported ambiguity rests on a baffling inversion of *Chevron*'s rules defining the permissible scope of agency interpretation. The defendants argue that "because the plain language of the statute could be interpreted to require the two years of qualifying work or vocational experience to be completed outside the United States, USCIS was permitted to promulgate regulations to interpret that language." Defendants' Mem., Dkt. 19, at 5. This is exactly backward. Plain language obviates, rather than creates, the need for agency interpretation. If the meaning of "seeks to enter the United States" were plain, there would be no occasion for USCIS to issue regulations interpreting those plain terms.

*authorization* for such work. They simply maintain that, because USCIS interprets § 1101(a)(27)(C) to apply to workers within, or without, the United States, "it is reasonable" to interpret the statute to require that work experience in the United States have been gained while in a work-authorized immigration status. Defendants' Mem., Dkt. 19, at 5. That conclusion, unadorned with supporting argument, is unpersuasive.

As a policy matter, reasonable minds can differ as to whether an immigrant should be able to qualify for lawful admission into the United States based on work performed while unlawfully in the country. But that is not the question before the Court. The precise question presented in this case is whether the statute that Congress enacted, which defines the class of immigrants who are eligible for a special immigrant religious worker visa, excludes individuals seeking to qualify based on work performed when they were not authorized to work in the United States. Because the statute's language does not contain such an exclusion, and because Congress plainly contemplated that some immigrants would be admitted to lawful permanent residence despite prior violations of U.S. immigration law, the Court concludes that the INA is not ambiguous as to the precise question at issue.

Since 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11) contradict Congress's intent in this regard, they are *ultra vires* to the INA. *Accord Shalom Pentecostal*, 2013 WL 162986, at *6 (D.N.J. Jan. 15, 2013) (finding 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11) to be *ultra vires* because they are "inconsistent with . . . the plain text of the statute"); *Shia Ass'n of Bay Area v. United States*, 849 F. Supp. 2d 916, 923 (N.D. Cal. 2012) (finding 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11) to be *ultra vires* because they are "inconsistent with the prevailing statutory scheme"). And since USCIS's denial of the Passionists' I-360 petition

was based on those *ultra vires* regulations, its decision was contrary to law. Accordingly, the Court grants summary judgment for the plaintiffs on their APA claim.[9]

\* \* \*

For the reasons set forth above, the Court grants the plaintiffs' motion for summary judgment and denies the defendants' cross-motion for summary judgment. The Court finds that 8 C.F.R. § 204.5(m)(4) and 8 C.F.R. § 204.5(m)(11) are *ultra vires* and that USCIS's decision denying the Passionists' I-360 petition on the basis of those regulations was contrary to law. The Court therefore orders USCIS to rescind its denial and issue a new decision granting the petition.

Date: February 6, 2015

John J. Tharp, Jr.
United States District Judge

---

[9] Given the Court's determinations on Count I that the regulations are *ultra vires* and that USCIS's decision was contrary to law, it is not necessary to consider the parties' constitutional and RFRA-based arguments with respect to those determinations.